UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| DUVALL, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civil No. 3:19-cv-00002-GFVT-EBA |
| ) | |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| UNITED STATES OF AMERICA, *et al.*, ) | **&** |
| ) | **ORDER** |
| Defendants. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon Plaintiff Leah Duvall's Motion for Partial Summary Judgment [R. 37] and the United States' Motion for Summary Judgment or Expert Exclusion [R. 36.] On January 4, 2019, Plaintiffs filed suit against Women's Care of the Bluegrass[1], alleging that Dr. Angela Saxena, an obstetrician, gave inadequate medical advice which caused the stillbirth of their son, MJR. [R. 1.] Within their Complaint, Plaintiffs allege that Dr. Saxena's negligence led to the personal injury and wrongful death of MJR, loss of consortium, breach of fiduciary duty, and breach of contract. [R. 1.] Plaintiffs now move for partial summary judgment regarding the duty and breach elements of their negligence allegation. [R. 36.] In response, the Government moves for summary judgment on all claims and, alternatively, seeks the exclusion of Plaintiffs' sole expert witness. *Id.* The Court, having reviewed the record and for the reasons set forth herein, will **DENY** both Motions [R. 36; R. 37.]

---

[1] Because Women's Care of the Bluegrass is an organization covered by the Federal Tort Claims Act, the United States substituted itself as the Defendant in this matter. *See* 42 U.S.C. § 233(g)-(h); 28 U.S.C. § 2679(d)(2); [R. 7; R. 9.]

# I

On March 28, 2017, Plaintiff Leah Duvall was 39 weeks pregnant. [R. 37-1 at 1.] Throughout her pregnancy, Ms. Duvall had been under the care of several practitioners at Women's Care, including Dr. Angela Saxena, an obstetrician. *Id.* On the morning of March 28, Ms. Duvall called Women's Care and was directed to Lori Shouse, a receptionist at the Versailles location of Women's Care. [R. 36-1 at 5.] During the call, Ms. Duvall informed Ms. Shouse that she was experiencing decreased fetal movement, asked for medical advice, and requested to "come in to the clinic to see Dr. Saxena." [*Id.* at 3; R. 42 at 4.] Ms. Duvall alleges that Ms. Shouse then placed her on hold, spoke with Dr. Saxena, returned to the phone, and stated that "if she was [*sic*] in labor she could go to the labor and delivery floor of the hospital in Frankfort, but she could try to eat a snack, calm down, and see if the baby's movement increased."[2] [R. 36-1 at 6; R. 37-1 at 2-3.] In opposition, Ms. Shouse disputes that the advice she relayed about going to the hospital was limited to solely if Ms. Duvall was in labor. [*See* R. 36-1 at 6.] Instead, Ms. Shouse states that, alongside the advice about having a snack, she informed Ms. Duvall that she "needed to go to labor and delivery if she had any concerns about the baby not moving or if she had any concerns personally […]." *Id.* Although the specific advice given is disputed, Ms. Duvall alleges that, as a result of her phone call with Women's Care, she believed herself to be overreacting, that this situation was not an emergency, and that, because she was not actively in labor, a trip to the Frankfort hospital was unnecessary. [R. 37-1 at 3.] Later that night, however, Ms. Duvall did go into labor. *Id.* at 4. Tragically, upon admission to the hospital, the medical staff were unable to identify a fetal heartbeat, and MJR

---

[2] Plaintiff Duvall argues that Ms. Shouse stated that she was likely "psyching herself out." [R. 37-1 at 2.]

was stillborn. *Id.* at 4. Both parties agree that MJR died as a result of his umbilical cord being wrapped around his body at his waist and ankle, which cut off his essential supply of blood and oxygen. [R. 36-1 at 7; R. 42 at 5.] What is not agreed upon, however, is whether Dr. Saxena's advice, relayed through Lori Shouse, breached the standard of care and caused MJR's death.

On March 15, 2021, Plaintiff Leah Duvall filed a Motion for Partial Summary Judgment [R. 37.] Within her Motion, Ms. Duvall asserts that there is no genuine issue of material fact regarding Dr. Saxena's duty to provide proper medical advice. *See id.* Moreover, she asserts that there is no genuine issue of material fact that that Dr. Saxena breached her duty. *See id.* In support of her Motion, Ms. Duvall relies on the expert report and deposition of Dr. Robert D. Eden, a board-certified obstetrician-gynecologist and maternal-fetal medicine specialist. [R. 15-1; R. 26.] Within his report, Dr. Eden asserts that, because Dr. Saxena did not advise Ms. Duvall to immediately go to the hospital when she called expressing decreased fetal movement, she breached her duty of care to Ms. Duvall. [R. 15-1.] In opposition to partial summary judgment, the Government argues that Dr. Saxena properly followed the appropriate standard of care and that Dr. Eden improperly characterizes the standard. [R. 44.] Separately, Defendants move for summary judgment and the exclusion of Dr. Eden's expert report, arguing that Plaintiffs have failed to create a genuine issue of material fact regarding whether Dr. Saxena proximately caused MJR's death and that various rules of evidence require the exclusion of Dr. Eden's report. [R. 37.] Finally, Defendants argue that Plaintiffs' claims of breach of fiduciary duty and contract should be dismissed because the Court lacks subject matter jurisdiction. [R. 36-1 at 2, n.2.]

## II

Because this matter arises under the Federal Tort Claims Act, Kentucky substantive law controls. *Crane v. United States*, 2014 WL 321134 at *1 (W.D. Ky. Jan. 29, 2014) ("The United

3

States' liability under the FTCA is determined by the law of the place where the alleged tort occurred."); *see also* 28 U.S.C. § 2679(a). Under Kentucky medical malpractice law, a plaintiff must prove, by expert testimony, "(1) the standard of care recognized by the medical community as applicable to the particular defendant, (2) that the defendant departed from that standard, and (3) that the defendant's departure was a proximate cause of the plaintiff's injuries." *Heavrin v. Jones*, 2003 WL 21673958 at *1 (Ky. Ct. App. July 18, 2003).

Though Kentucky state substantive law applies, federal procedural law remains controlling. *See Crane*, 2014 WL 321134 at *1. Under federal procedural law, summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corp. of the Pres. of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court must then determine "whether the evidence presents a sufficient disagreement

4

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). In doing so, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013).

## A

"[I]n medical malpractice cases the standard of care for a physician is that of a reasonably competent physician of the same class under similar circumstances." *Cocanougher v. Atkins*, 2013 LEXIS 652 at *8 (Ky. Ct. App. Aug. 9, 2013) (citing *Grubbs ex rel. Grubbs v. Barbourville Family Health Center, P.S.C.*, 120 S.W.3d 682, 687 (Ky. 2003)). In her Motion, Ms. Duvall argues that partial summary judgment must be granted regarding the duty and breach elements of her medical malpractice cause of action. [R. 37-1.] On March 28, 2017, when Ms. Duvall called Women's Care expressing concern about her baby's decreased fetal movement, she was instructed by Ms. Shouse to eat a snack, lay down, to see if her baby began to move normally, and, if she were in labor, to go to the hospital. [R. 36-1 at 6.] In her Motion, Ms. Duvall argues that this advice was improper and, accordingly, a violation of the standard of care. [R. 37-1.] To establish the appropriate standard of care that Women's Care should have followed, Ms. Duvall relies on the expert report of Dr. Robert D. Eden, a board-certified obstetrician-gynecologist and maternal-fetal medicine specialist. [R. 15-1.] In his report, Dr. Eden states that Women's Care should not have instructed Ms. Duvall to eat a snack, lay down, or take any measure which would further delay the time in which her baby might have been experiencing distress. *See id.*

5

Instead, Dr. Eden argues that Ms. Duvall should have been instructed to immediately proceed to the office or a hospital to have a non-stress test conducted.[3] *See id.* Dr. Eden states that instructing a patient to undergo immediate non-stress testing when she complains of decreased fetal movement has been the standard of care for "almost four decades," and that, because Ms. Duvall was told to conduct a series of at-home tests and then to herself determine whether she needed to go to the hospital, Dr. Saxena and Women's Care breached the standard of care. *See id.*

Although the United States does not provide its own expert witness, it disputes that the appropriate standard of care in this situation is to always immediately instruct a patient to undergo a non-stress test. Instead, the United States argues that the standard permits a doctor to first instruct a patient to perform a series of at-home tests if they experience decreased fetal movement. [R. 40 at 2.] It is when these tests reveal abnormal results, however, that the standard requires the patient to be instructed to go to the hospital for a non-stress test. *Id.* In support of this opposing standard, the United States relies on statements made by Dr. Saxena and Dr. Eden in their depositions. [*See* R. 40.] First, the United States argues that Dr. Saxena followed the appropriate standard of care because she did not instruct Ms. Duvall to only go to the hospital if she was in labor but, instead, instructed her to eat something, lay down, and then proceed to the hospital "if [she] continue[d] to have issues with [decreased fetal movement] or anything else […]" [R. 40 at 2.] Within her deposition, Dr. Saxena makes clear that this response is her common practice and that eating and laying down is intended to produce

---

[3] A non-stress test monitors the change in a baby's heart rate caused by movement and can detect if a baby is in distress by analyzing whether its heart rate accelerates at a normal rate. [R. 26 at 72.]

6

movement by the baby.[4]  [*See* R. 22 at 18.]  Additionally, the United States argues that "[e]ven if we accept Plaintiffs' characterization of the applicable standard of care in this case," there is no record evidence that the staff at Women's Care violated the standard because Dr. Saxena testified that, on March 28, the Women's Care staff instructed Ms. Duvall to go to labor and delivery.  [R. 40 at 3.]

Furthermore, the United States contends that Dr. Eden's testimony about the appropriate standard of care is contradictory.  *See id.*  For example, although Dr. Eden's expert report explicitly states that the standard of care was violated because Ms. Duvall was not immediately instructed to undergo a non-stress test, he also states in his deposition that it is appropriate for a physician to first request the patient to have a snack, sit down, and see if the baby's movement changes prior to undergoing a non-stress test.  [R. 26 at 77.]  Consequently, it is unclear what Dr. Eden proposes to be the controlling standard of care in this matter.[5]  Ultimately, because there remains a genuine issue of material fact as to the exact instructions given to Ms. Duvall on March 28, the extent of medical advice given to Ms. Duvall prior to March 28, and whether the standard of care allows a physician to instruct a patient to perform a self-assessment at home

---

[4] Although Ms. Duvall alleges that Women's Care never instructed her how to properly monitor fetal movement, the Court surmises that the instructions provided to her by Women's Care on March 28 were intended to get her baby to kick and allow for self-monitoring.  [R. 24 at 9-10.]
[5] Upon review of Dr. Eden's deposition, it appears that the standard of care he proffers assumes that Ms. Duvall had been instructed to perform a self-assessment prior to calling the doctor's office.  As a result, Dr. Eden argues that the standard of care was to immediately advise her to go in for a non-stress test because she had already completed a self-assessment and remained concerned.  However, the record is unclear as to whether Ms. Duvall had previously been instructed to monitor fetal movement prior to March 28.  Additionally, the record is unclear as to whether the standard of care allows a physician to instruct a patient to self-monitor fetal movement before advising the patient to undergo a non-stress test in situations where the patient has not been previously taught how to monitor fetal movement.  [*See* R. 26 at 78.]

7

before undergoing a non-stress test, Ms. Duvall's Motion for Partial Summary Judgment on the issues of duty and breach **[R. 37-1]** is **DENIED**.

**B**

Next, the Court turns to the United States' Motion for Summary Judgment [R. 36-1.] In its Motion, the Government argues that Plaintiffs fail to provide sufficient evidence of proximate causation for their negligence claim to survive summary judgment. *See id.* Under Kentucky medical malpractice law, "[t]o be the proximate cause of the injury, the conduct in question must be a substantial factor in causing the injury." *Ashland Hosp. Corp. v. Lewis*, 581 S.W.3d 572, 577 (Ky. 2019). Moreover, "proximate causation must be shown by a reasonable degree of medical probability, rather than mere possibility or speculation." *Id.* at 577-78.

In support of its argument that Plaintiffs failed to prove that the medical advice provided by Women's Care was a substantial cause of MJR's stillbirth, the Government analyzes Dr. Eden's expert report and deposition. In his expert report, Dr. Eden states "[s]ince one can only reasonably conclude that the patient was not managed properly, the deviation in the standard of care would clearly serve as causation for the intrauterine fetal demise and the loss to the mother and father as claimed […]." [R. 15-1 at 3.] Similarly, at his deposition, Dr. Eden stated that, because "decreased fetal movements occur[] within hours or days of the death […]," the failure to instruct Ms. Duvall to undergo a non-stress test hours before MJR's stillbirth inherently establishes proximate causation.[6] [*See* R. 26 at 95.] When pressed for which specific facts led

---

[6] Additionally, Dr. Eden analyzed at his deposition that the lack of meconium staining in Ms. Duvall's womb led him to believe that MJR had died only hours before his delivery and, as a result, a non-stress test would have likely saved his life. [R. 26 at 96-100.] The United States strongly disputes whether Dr. Eden is qualified to engage in a pathological analysis of the lack of meconium staining and further argues that his analysis is incorrect. In response, Plaintiffs state that Defendants are effectively "getting into the weeds," that Dr. Eden's testimony about MJR's pathology report "has very little, if any, bearing in this case," and that causation is established by

him to conclude that inadequate medical advice proximately caused the death of MJR, Dr. Eden stated that "there are no other facts in this case" that provide an alternative proximate cause. *See id.* In response to these assertions, the Government argues that Dr. Eden conflates the concepts of breach and causation and fails to provide adequate support to connect Women's Care's actions to the death of MJR. [*See* R. 45 at 9; ("Well-settled Kentucky and the Sixth Circuit case law, however, shows that this "automatic" assertion of proximate cause fails to meet Plaintiffs' burden.") (citing *Jackson v. Ghayoumi*, 419 S.W.3d 40, 45 (Ky. Ct. App. 2012)).]

In opposition, Plaintiffs make several arguments. First, Plaintiffs cite to *Deutsch v. Shein*, 597 S.W.2d 141 (Ky. 1980). In *Deutsch*, a doctor failed to give a plaintiff a pregnancy test before exposing her to radiation. *Id.* at 146. As a result, the plaintiff decided to have an abortion because the doctor informed her that the "radiation she received would have dire consequences upon the developing fetus […]." *Id.* However, at trial, the defendant was acquitted because the jury found that his failure to give the plaintiff a pregnancy test was not a substantial factor in the injury caused by her abortion. *Id.* On appeal, the Kentucky Supreme Court reversed and found that, under the substantial factor test, a jury need not determine if the plaintiff's injury followed a defendant's negligence but, instead, must determine whether the event which led to injury was proximately caused by that negligence. Consequently, the Court ruled that the jury should have decided whether the abortion was caused by the doctor's negligence, not whether the death of the fetus was caused by his negligence. *See id.* Although their argument is unclear, the Court surmises that Plaintiffs believe, under *Deutsch*, the Court need only determine that Ms. Duvall's foregoing of a non-stress test was caused by Women's

---

the remainder of Dr. Eden's testimony. [*See* R. 42 at 23.] Accordingly, the Court finds the topic of meconium staining to have little relevance to this motion.

Care, not the stillbirth of MJR itself. [*See* R. 42 at 9.] However, in reply, Defendants clarify that *Deutsch* is limited to situations in which a superseding intervening cause leads to a plaintiff's claimed injury. [R. 45 at 4 (citing *Branham v. Rock*, 449 S.W.3d 741, 751-52 (Ky. 2014).] The Court agrees with Defendants that, because no superseding intervening cause of MJR's stillbirth is alleged to exist in this matter, *Deutsch* is not controlling, and Plaintiffs' effort is misplaced.

Next, Plaintiffs argue that two non-binding cases require denial of summary judgment. [R. 42 at 21-23.] First, Plaintiffs refer to *1st of Am. Bank, N.A. v. United States*, 752 F. Supp. 764 (E.D. Mich. 1990) in which a doctor witness stated that "the best test for causation of outcome is whether the outcome is predictable." *Id.* at 792. Plaintiffs state that because a stillbirth is a predictable outcome from a patient's receipt of inadequate medical advice, they have provided sufficient evidence of proximate causation to prevent summary judgment. [R. 42 at 21.] However, in response, Defendants point out that, not only is this case non-binding on the Court, but the "standard" Plaintiffs refer to was promulgated by a witness, not the district court, and therefore holds no weight. [R. 45 at 12.] The Court agrees with Defendants that *1st of Am.* is unpersuasive. Second, Plaintiffs argue that *A.J.J.T. v. United States*, 2020 U.S. Dist. LEXIS 13903 (M.D. Tenn. Jan. 28, 2020) requires the Court to deny summary judgment. [R. 42 at 21-22.] In *A.J.J.T.*, the district court held "[p]roximate cause […] does not require that the plaintiff suffered the most likely injury, just that the harm was of a type that could be reasonably foreseen." *Id.* at \*36-\*37. Plaintiffs argue that, in this case, because "MJR's death was a foreseeable risk of failing to properly evaluate [Ms. Duvall]," proximate causation has been sufficiently proven to survive summary judgment. [R. 42 at 22.] In response, Defendants argue that even the application of a "foreseeability" standard does not solve the speculative nature of Dr. Eden's report and deposition. [R. 45 at 13.] Moreover, Defendants argue that *A.J.J.T.* is

10

factually distinct and unpersuasive. *See id.* Because the proximate cause standard in Kentucky medical malpractice actions is "substantial factor" and not "foreseeability," and because *A.J.J.T.* is factually distinct from the current matter, the Court agrees with Defendants that Plaintiffs' argument is unpersuasive.

Nonetheless, despite the wholly unpersuasive nature of Plaintiffs' response briefing and the skeletal expert report provided by Dr. Eden, the Court is not inclined to grant summary judgment after analyzing Dr. Eden's testimony more thoroughly. For example, when asked about the history of non-stress tests and why they have become common practice for patients experiencing decreased fetal movement, Dr. Eden opined that in the mid-1980s it was proven that the administration of a non-stress test and ultrasound to pregnant women experiencing decreased fetal movement lowered the prenatal mortality rate by twenty percent. [R. 26 at 68.] Additionally, in his expert report, Dr. Eden cites to academic literature which states that "a diminution in the maternal perception of fetal movement often but not invariably precedes fetal death [...]" and that "further assessment is recommended" when a reassuring fetal kick count is not present.[7] [R. 15-1 at 3.] Consequently, because Kentucky mandates that the "substantial factor" proximate cause test be applied in medical malpractice cases and because the court must draw all reasonable inferences in favor of Plaintiffs, the Court finds that the statistics and causal analysis that Dr. Eden provides in his deposition and report create a genuine issue of material fact as to whether the medical advice provided by Women's Care was a substantial factor in the death of MJR. *See Logan*, 259 F.3d at 566. As a result, Plaintiffs narrowly survive summary

---

[7] Though Dr. Eden takes issue with the idea that the existence of a "reassuring kick count" precludes the need for further assessment, he cites to this article as evidence that further assessment is often needed when a mother experiences decreased fetal movement. [R. 26 at 67; R. 15-1 at 3.]

judgment and the Government's Motion [**R. 45**] is **DENIED** as to the issue of proximate causation.

**C**

The Government next argues that Plaintiffs' breach of fiduciary duty and contract claims must be dismissed because the Court lacks subject matter jurisdiction over those claims. [R. 36-1 at 2, n.1.] In support, the Government contends that, because the basis asserted for jurisdiction in this matter is the FTCA, which only establishes federal jurisdiction over tort claims, the Court lacks subject matter jurisdiction over Plaintiffs' additional claims. *Id.* (citing *Unions Pacific R.R. Co. v. United States*, 591 F.3d 1311, 1314 (10th Cir. 2010) ("the FTCA […] waives the government's immunity for tort claims […]."). Secondly, the Government states that Plaintiffs are barred from bringing their breach of fiduciary duty and contract claims because they did not present them in their original administrative claim. [R. 36-1 at 2, n.2 (citing 28 C.F.R. Part 14; 28 U.S.C. § 2401(b)).] Plaintiffs respond that the Court has supplemental jurisdiction over the claims and requests time to fully brief this issue. [R. 42 at 6, n.2.] Though the Court recognizes that the FTCA appears to only establish a limited waiver of sovereign immunity as to tort claims, it will permit further briefing on this issue. Accordingly, the Government's request is **DENIED**.

**II**

Lastly, the Court turns to the Government's argument that Dr. Eden's expert report and testimony should be excluded under Federal Rule of Evidence 702. [R. 36-1 at 9-24.] Rule 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The Sixth Circuit has identified three specific Rule 702 requirements in deciding the admissibility of proposed expert testimony. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008). First, the proposed expert must have the requisite qualifications, whether it be through "knowledge, skill, experience, training, or education." *Id.* at 529 (quoting Fed. R. Evid. 702). Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quoting Fed. R. Evid. 702). Third, the testimony must be reliable. *Id.*; *see also Daubert*, 509 U.S. at 590.

As to the third requirement, Rule 702 provides a number of standards by which a district court in its gatekeeper role is to gauge reliability of expert testimony. A court should look to whether the testimony is based upon "sufficient facts or data;" whether it is the "product of reliable principles and methods;" and whether the expert "has applied these principles or methods reliably to the facts of the case." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting Fed. R. Evid. 702). Additionally, in determining reliability, a district court is to consider "such factors as testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific [or technical] community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593-94). The reliability inquiry is a flexible one, and the above factors are not a "definitive checklist or test." *Daubert*, 509 U.S. at 593.

District courts are given broad discretion in determining whether a particular expert's testimony is reliable. *See, e.g., Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[T]he trial judge

13

must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). Notably, in exercising this discretion, a court must be careful not "to impinge on the role of the jury or opposing counsel." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014). Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Though the United States does not contend that Dr. Eden is not qualified to testify in this matter nor that his testimony will be unhelpful to the trier of fact, it does argue that, for multiple reasons, Dr. Eden's testimony is unreliable. First, the Government contends that Dr. Eden's analysis of the standard of care and proximate causation is unreliable because he fails to explain how he reached his results and because he heavily relies on his own "conclusory opinions." [R. 36-1 at 10. (citing *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 521 (6th Cir. 2014)).] Regarding causation, the Government first frames Dr. Eden's testimony as illogically attempting to establish a pattern of wrongdoing by Women's Care to prove that Women's Care "clearly serve[s]" as the proximate cause of MJR's death. [*See* R. 36-1 at 12-13 (quoting *Davis v. United States*, 302 F. Supp. 3d 951, 959 (S.D. Ohio 2017) (citing *Kumho*, 526 U.S. at 157) ("[T]here is no requirement that a district court admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."))]. Second, the Government points to Dr. Eden's testimony as further evidence of his unreliability. In his deposition, Dr. Eden argues that Dr. Saxena's alleged breach of duty simultaneously serves as the proximate cause of MJR's death. [R. 36-1at 17 (citing *Rolen v. Hansen Beverage Co.*, 193 F. App'x 468, 473 (6th Cir. 2006) ("[e]xpert opinions based upon nothing more than the logical fallacy of *post hoc ergo propter hoc* [after this, therefore because of this] typically do not pass muster under *Daubert*."))]

Third, the Government argues that Dr. Eden's analysis of the standard of care is unreliable because it "fails to denote which practitioners among the staff at Women's Care violated the standard of care." [R. 36-1 at 13.] Finally, the Government contends that Dr. Eden contradicts himself regarding the standard of care between his report and deposition and improperly opines on the veracity of each party. [R. 36-1 at 14-15.]

In response, Plaintiffs rely on Dr. Eden's statements, references to statistics and academia, and personal experience described during his deposition to show reliability. [R. 42 at 14-19.] Although Plaintiffs do not specifically counter each of the Government's arguments, they point to Dr. Eden's testimony that non-stress tests reduce the likelihood of stillbirths in cases involving decreased fetal movement by twenty percent as evidence that failing to clearly instruct Ms. Duvall to undergo a non-stress test was a "substantial factor" in the death of MJR. *See id.* at 15. Accordingly, Plaintiffs assert that exclusion of Dr. Eden's testimony is improper.

Upon review of the record, the Court agrees with Plaintiffs that the exclusion of Dr. Eden's testimony is improper. First, although Dr. Eden does not specifically state which employee of Women's Care that he believes to have violated the standard of care, his report clearly argues that the advice given by Dr. Saxena and relayed through Ms. Shouse was negligent and the cause of MJR's stillbirth. Similarly, though Dr. Eden does analyze the veracity of the parties in his report, a limiting evidentiary motion can adequately address this issue and complete exclusion is not required. Moreover, despite the Government's position that Dr. Eden does not explain how he reached his conclusion that Dr. Saxena's medical advice was a "substantial factor" in the death of MJR, Dr. Eden refers to multiple textbooks and articles in both his expert report and deposition as support and explanation for his position. [R. 15-1 at 3; R. 42 at 19.] Finally, although the Court agrees with the Government that "it is inherently

15

speculative to testify about what a test that was never administered would have shown," proximate causation analysis in Kentucky only requires proof that a party's negligence was a "substantial factor" to another's injury. [R. 36-1 at 23 (quoting *Kaiser v. Monroe Clinic, Inc.*, 2020 WL 4364179 at *6 (W.D. Wis. July 30, 2020)).] Because Dr. Eden's testimony is supported by references to academic research, statistics, and personal experience, it is sufficiently reliable to be used to determine whether the medical advice provided to Ms. Duvall violated the standard of care and was a "substantial factor" in MJR's death. Consequently, the Government's Motion to Exclude [**R. 36-1**] is **DENIED**.

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The United States' Motion to Exclude Expert Testimony or, in the alternative, Motion for Summary Judgment [R. 36] is **DENIED**;

2. Plaintiffs' Motion for Partial Summary Judgment [R. 37] is **DENIED**;

3. Parties shall have twenty (**20**) days from the date of the filing of this order to provide supplemental briefing as to the issue of this Court's subject matter jurisdiction over Plaintiffs' breach of fiduciary duty and contract claims.

This the 28th day of June, 2021.

Gregory F. Van Tatenhove
United States District Judge